Good morning. My name speaks to the Court. I am Ty Frenkel, and I represent the Plaintiffs' Appellants, a class of airport drivers. I'd like to reserve three minutes for rebuttal. The seminal issue on this appeal, and in this case, is the critical question of whether or not the airport drivers are economically dependent on Circulate Yellow Cap, and thus whether or not they are employees under the Fair Labor Standards Act and Arizona's Minimum Wage Statute. The question boils down to this. Are the airport drivers in business on their own, or are they dependent on the company for which they work to obtain their business? To answer that question, it's critical to recognize that the taxi drivers, the airport drivers, are not your typical taxi drivers driving around the streets of Phoenix for business. In fact, AAA Yellow Cap has an entirely separate division of street drivers who perform that type of work. The airport drivers that issue in this case are hired by AAA Yellow Cap for the specific purpose of providing the labor necessary to satisfy AAA Yellow Cap's contractual obligation to provide a taxi cab service at the airport. The airport driver's typical day is spent waiting at the C-Lot at the airport, which is the holding lot where they're operating a AAA Yellow Cap-owned taxi, waiting to be summoned to take a passenger at the terminal. During this time, Mr. Fang, the District Court seemed to have looked at the six-factor test that we applied here and concluded that enough elements of the test were meant to establish economic independence. Do we review that on the basis of abuse of discretion and the application of the factors, or is it completely de novo because it is sort of a mixed question of law and fact? The review is de novo, but the legal question is whether or not the airport drivers are in business on their own. Well, I understand that, but if the test is one of economic dependency, and one of the factors the District Court cited was that the payments that the passengers make are kept by the cab drivers, that's a pretty significant fact, and you're not contesting that, are you? No, but I think that you bring a critical point to the attention of this Court, which is that that's exactly where the District Court got the economic realities test wrong. The economic reality is that the passenger pays for the taxi ride, and the driver keeps the fare. Now, there are costs that the driver has. He's a cab, gasoline, crelts, cleaning products, that sort of thing, but that's a pretty significant fact, isn't it? The reason the District Court looked at the issue is to determine whether or not she should find a strong inference for independent contractor status. Well, don't they keep their own hours? Don't they decide what days they're going to work and what hours they're going to work, and they can work as little or as much as they want? That's incorrect, and the reason being is AAA Yellow Cab enters into a contract with the City of Phoenix enabling it to operate at the airport, and as part of that contract, it assumes the responsibility for making sure that its airport drivers adhere to numerous rules and regulations. In doing so, one of the requirements is to make sure that the airport drivers are present at the airport during peak times at 85%, and during any time, the passenger wait times have to be at a minimum of five minutes. So you're suggesting that if a driver wants to take Wednesday off, he can't because AAA meets at 4 o'clock on Wednesday afternoon? There's undisputed evidence and undisputed testimony from the AAA Yellow Cab's lead supervisor, Jack Gilman, and she testifies that in conjunction with the City of Phoenix monitoring by GPS, the whereabouts of the airport drivers to make sure that the companies meet against the requirements. I'm not sure you're answering my question. If I'm a driver and I decide I don't want to work on Wednesday, are you saying that I have to work anyway? There are cases cited in our reply brief. Counsel, it's a factual question. I don't want a legal case cited to me. I just want to know the answer to my second question. If a driver doesn't want to work on Wednesday, does he have the authority to decide to take the day off? It's not clear. There's not clear fact. All right. Counselor, I read the depositions. The answer is yes, he can take the day off if he doesn't want to work on Wednesday, or he can arrange to have a relief driver come on Friday. Right. It doesn't have to be there on Wednesday at 4 o'clock. Isn't that what the record shows? The record shows that a certain number of airport drivers have to be present. Whether the airport drivers link any worker alike to share their shift with another airport driver, I estimate, too, that that is correct, that they have the opportunity to be able to do that. But he can't take the day off if he doesn't want to work. Right. Just like any employee can do. I guess that's what I'm confused about. You're saying that the cab companies require cabs. I don't know if that actually does. Let's just talk about what it means. 85% of the cab companies are going to have their cabs, but the other cabs aren't going to be able to do so. Between 140 and 180. That's the requirement under the airport contract. Okay. So let's say that there are 140 drivers that are available, and during peak times the company has to ensure that 85% of that number, or 85% of 140, has to be on duty. 85% of the taxi cab fee has to be servicing the airport, according to the terms of the Triple Yellow Cup contract with the city. And, in fact, the city of Phoenix representative testified that the typical number, based on the AVI tracking systems, attracts the airport driver taxi cabs. In fact, just that 95% of Triple Yellow Cup's fee is, in fact, servicing the airport. Okay. So is that just because, I mean, this is what you were saying in response to what I just told you, is that just because it turns out that each of the drivers has an economic incentive to not take Wednesday off, and so it just happens that the company never has to coerce anybody to come in? Because it can't be true that everybody can take Wednesday off, right, if they wanted to, and 85% of the drivers have to be able to, during peak times, the company would have to have some mechanism of coercing people to come in on Wednesday, because you guys have to be here. But you're just saying that just the way it happens is that people just want to park on Wednesdays, and so there's always enough people to be there, if you can call it that. No, the taxi company absolutely has the ability to require airport drivers to be present at the airport, and Jack Gilman, the airport fleet supervisor, who is in company management, unequivocally testified that if he receives word that the number of airport drivers is not sufficient to satisfy the airport's requirements, he sends out messages to the airport drivers, and when asked what happens when he sends out those messages, he testified unequivocally that the airport drivers always return. What would happen if they didn't? That was the exact question. The question was, well, what happens if they don't? And he said that they always do a service to the airport. Well, because it's in their economic best interest to do that, right? It means that there are lots of people who are waiting for cabs, and the airport needs them to service the customers. Well, the legal standard under the Fair Labor Standards Act is the question of economic reality, and the fundamental question is, what do the airport drivers do? And the District Court of Columbia – I'm sorry, the Circuit Court of the District Court of Columbia – I'm sorry, the Circuit Court of the D.C. – D.C. Circuit Court. The D.C. Circuit Court addressed this issue in the city of Orlando case and looked at precisely what we're talking about, questioning the nature of the market. And in that case, they said the requirements with respect to their fleet involved dispatch, and it was dispatch that the company used to control how the drivers in that case operated their vehicles. And they looked at the nature of the market, and they said that effectively only 10 percent of the drivers in that case could – could be generated outside of the dispatch requirements. And here I would submit the undisputed testimony from the city of Phoenix representative indicating that 95 percent of the airport drivers are in fact servicing the airport, which is a AAA yellow cab contractual obligation that it imposes on its airport drivers. It shows that the nature of the market here requires them to be doing that. The obligation is actually imposed on AAA by the airport, isn't it? The source of that authority is the airport setting a standard of what level of cab service they want to see at the curb of the airport. Correct. So AAA yellow cab entered into a commercial contract with the city of Phoenix that it benefits from financially in order to operate at, and then AAA enters into a separate contract with each of the individual cab drivers so that they can meet their obligation to the airport, right? Isn't that how it works? With two separate contracts? Correct. Okay. But by definition, under the airport contract between AAA yellow cab and the city of Phoenix, AAA yellow cab unequivocally and affirmatively assumed the responsibilities to make sure that its airport drivers are adhering to numerous rules and regulations, and it does, in fact, which are set by the airport or the city of Phoenix. Some are and some aren't. And, in fact, there are numerous indications of control where AAA yellow cab is exerting its control over the airport drivers far beyond anything that the city of Phoenix would. I thought the district reported to things like the inspectors that are employed by the airport who have the authority to issue notices of violations, which can then ultimately result in discipline on the drivers and perhaps ultimately revocation of the permit that the airport issues to allow them to pick up passengers at the airport. There is, in fact, a city of Phoenix notice of violation process, and I'll actually point the court to the record, Exhibit Record 168 to 169, and there the city's point system is outlined. As a matter of course, it's important to recognize that the AAA yellow cab does have a representative present that takes part in the city's own process. But more critical than that, an enforcement process that the city initiates against the individual cab or the company or an individual cab drivers So there is the notice of violation process. But more critical than that is the fact that AAA yellow cab also has its own written disciplinary procedures separate and apart from the city of Phoenix process that's far stricter than anything the city requires. And there are written memorandum in the record documenting that, and I can offer some examples for the court. We're going to save three minutes. If I could just repeat this point. So just point out that there is a disciplinary process by AAA yellow cab stricter than the city of Phoenix that shows the dependence that these drivers have. The disciplinary process effectively takes away the airport driver's ability to operate. It takes away their ability to have any sort of economic benefits. For example, in the record, there's a memorandum at Executive Record 108 documenting the written disciplinary procedure for AAA yellow cab regarding the requirement that drivers take the most direct route. If a driver doesn't take the most direct route, AAA yellow cab will terminate the driver, quote, immediately. Period. Isn't that standard set by the city of Phoenix so that people are influenced by taking long, torturous routes to get on board? Two important points on that. One, it doesn't matter whether the rule comes from the city of Phoenix. The third, I think it does, because if it's the city or the airport that's setting these obligations, then it becomes part of the obligation of the drivers to abide by the regulation. That's significant as a matter of fairness. What the Fair Labor Standards Act requires the court to look at is what's actually happening on the ground. Is the city and the airport norm licensing the drivers, right? In order to keep their licenses, they have to abide by all these rules. Well, in AAA yellow cab routines, the right to terminate the drivers and revoke their ability, and the city reserves the right to revoke their licenses. And without a license, that can't work. Correct. Again, to the point, any AAA yellow cab disciplinary process is stricter than the city of Phoenix requirements. And the memorandum I referred you to, in Act Certificate Record 108, proves that point. We're not taking the direct route. The most direct route results in immediate termination of the driver. In comparison to the city of Phoenix process, where the driver would be assessed 10 points, in which case that wouldn't even result in a suspension under the city of Phoenix's rules. You have 36 seconds left. I would like, other than word of mouth. I'll reserve some time for a moment. Okay. Thank you. I'll try to give you a microphone here. My name is Laurent Benjamin Christy-Quartz. I represent the defendants' alleys in this particular matter. I referred to them as AAA yellow cab to make it a little bit easier on everyone. I think this case is really about the plaintiff's tendencies and trying to focus so much on the details and the details of the big picture. Really focusing on a single train, blocking that single train, to the point that he's looking at it in the middle of the forest. That's really what this is all about. You brought up a number of important points in this particular matter. First and foremost, the yellow cab, I wouldn't even say of the long majority of cabs, I can't think of a single rule that is not dictated upon the drivers by the city of Phoenix, the state of Arizona, or the insurance requirement of the yellow cab. I don't know if it was the end. Actually, the whole next number, as you touched on before, in terms of the most correct route, for instance, that's an obligation that derives from two separate sources, the state of Arizona and the city of Phoenix. They both demand that. And both demand that there would be a meter in the cab that is accurate so that it can be properly measured and based in terms of the fare that the passenger has to pay that is dependent upon the duration in miles and in time if there's idle time  That fare is set by the city of Phoenix in its ongoing regulations. To their credit, the plaintiffs were very close to convincing the district court that all of these were actually requirements that the yellow cab would impose. And that simply is not the case. If you look at... If you listen to what Mr. Frankel said, he believes that it's not important where those rules, quote-unquote, originate. Well, that's not what their answer is. He has said in not one but two separate occasions that the SIDA of Hawaii D.S. and the friendly cab case in both of those court was crudely clear that obligations that arise from a governmental entity are the obligations of that governmental entity. They are not an issue of control but an employment situation between the various parties. The SIDA is particularly clear because the SIDA had two separate elements. Not only were the rules and regulations of the case a matter of laws, the ordinances and safeguards were applicable, in effect, but there was also an international relationship between SIDA and the airport authorities. So in that particular scenario, we'd be exactly in the same position. And that panel that I took in counted those particular components that were incorporated in a contract with a third-party provider were still the elements that were dictated by a municipal entity or a governmental entity. And you made another point, Your Honor, that's important. You said the city has an agreement with, particularly, Yellow Cab. It also has agreements with two of those three providers, precisely, with Yellow Cab. And Yellow Cab has agreement with drivers. Yellow Cab has three separate sets of agreements. It has a peace agreement with some drivers. It has a peace purchase agreement with others. And others are owners, operators of their own cabs. That's all for the minute in this record. Confusion can come right out. What's important is that the city has contracts itself with each of the drivers. If you look at the regulations, just as an example, in five pages of one code section, there are 40 independent obligations that the city imposes on drivers. And one of them is that if you apply to be a driver at the airport, if you do, you agree that you are going to be bound  that may be applicable to you, whether they're state, whether they're federal, or whether they're local. You have your own agreement as a driver that you're going to abide by the rules that are set. But that's the thing, is you don't get it. You don't get it if you don't agree to it. That's the application of the rule. Okay, but just going back to the, unless you can talk about the peak time, the 85% requirement, because just as a conceptual matter, it does seem as though for the company to be to be confident that it can meet that, it does seem to need to have people all over the drivers in the sense that we need to make sure that at least 85% of these people are on the ticket during this time. So that's one thing. And then I guess if they're then compelled to go to the airport, I just wondered if there's any testimony about how long, how much time is it going to take at the airport waiting for the fare as opposed to being able to cash your money away. And then I'll say my concern is that you know, if the company could compel the drivers to show up at the airport and they would then have to sit there for hours waiting for a fare, then I understand why, you know, maybe they do need to be paid a minimum wage because your client is requiring that in order to satisfy his contractual obligation. So I can see the unfairness of how the drivers are looking on the airport. They're just going to communicate, we have to be here, but we can't be out there burning our own independent fares. And we're not making this money to make it to them. So that's my concern about your position. Thank you, Judge Warford. No, there's no obligation that the driver return. In fact, I'll go back to an example that Judge Solomon was mentioning regarding Wednesday which was at this deposition testimony from a lead plaintiff in the class matter, Mr. Boateng, who specifically testified that on Saturday, I believe it is, he sees his massage clients in the morning because it's a slow day at the airport. Somebody else wears a scarf or doesn't, but he doesn't care. He doesn't pick up the phone and report it if there is a spike. He has his own business on the side on Saturday, which is doesn't show up. And no one is fencing for it because no one knows if he is there actually. On my client's side, you know, he never kept a top order. His whole schedule is in the morning time. It's the time keeping, which I don't know if it's usually there. And I take offense to the fact that an employee could just decide not to show up. No, an employee may take a sick day and probably will be deducted from that person's leave bank. Or if they don't have all the minutes to do a job because they don't report to work. It's absolutely not the same situation here. As long as Mr. Boateng pays for his fees, he will retain his salary. So let's say that half the drivers decide for whatever reason, I don't know, that the Super Bowl is happening or something. They all want to report to work. And obviously the company has some mechanism to ensure that 85% of our drivers are in peak time during this. No, actually, we will be facing, AAA Yellowjack will be facing a fine. Let's say maybe, perhaps not the Super Bowl, but maybe the final of the World Cup. Might be more appropriate sporting events, I imagine. But, let's say that were to occur in this particular context, we had a dearth of adventure to cast that we would have to pay a fine. Because we do not have the method to compel their attendance. As Mr. Yeoman said, if there was money to be made at the airport, which is the way in which he states it, he says it to the drivers. He says, there's money to be made at the airport. There's a dearth of cabs at the airport. Everybody wants to make money. Come on back. They do. It's a financial interest that they have. It's their own decision to come back. That's why we never had to compel it. If there wasn't a fund that required us to compel it, we'd be up the creek without a paddle, because there is no mechanism in place. So your argument is that the mechanism is economic incentive, that if there are lots of passengers waiting at the airport, the cab drivers want to be there, they go up to them and they get the fare. Absolutely. It's offer and demand, which is the business incentives that you have in these contexts are very present here. There are three other companies that are out there. If another company is going to offer a lease at a much lesser rate, they might fund that particular company because it's more advantageous. If you start finding people left and right who move to other cab companies to actually provide their services, because they have something valuable, which is a license to operate at the airport. Do you have a point there? Here's the interesting part. We don't track, so we really can't tell you. You can say that there are days where there are 15, 16 fares, and we can tell because of what the city has put in place, which is all UVI, Automated Vehicle Information. They essentially track the vehicles as they cycle through, the cabs as they cycle through, in the Prohibited Act section, which is 470 of the city code. It actually states that if you are disabled or don't provide one of those, you're in violation, and you can be subjected to one deduction to your driver. And in fact, there have been drivers who have hidden essentially those particular UVI signals on a cab. In fact, it was a claim by the city of Phoenix, not by my clients, by the city of Phoenix for doing that because it's a violation of their own obligation, which they agreed to, and of the law. In that particular context, we see sometimes 15 fares in a given day. It's likely that if you have 7 fares, you will be in the assembly for a certain period of time, waiting for the dispatch agency to get accorded by the city of Phoenix not by its own cab, and sent to whatever terminal. You might have to wait at that terminal again. That's an outside. See, the Phoenix Sky Harbor is the largest economic engine. It's the largest place in the city of Arizona to draw passengers from. They're inherently valuable, those licenses, to be able to pay back on any payment you may have, and be able to hold a bond to be able to pay a fine. There are, of course, some hard times. You might wait 2 hours. There are times where you wait 30 seconds because it's a demand, and that's an economic decision that the drivers do. One of those elements of the economic decisions that you have to do is, do they pass along their vehicle to somebody else? Do you drive around the clock? For instance, as a final reason, the state of Arizona and the state of California has a 10-hour maximum for operation of your cab. So they are finally supposed to pass along a form of regulation to memorialize that. If you couldn't keep driving your cab for more than 10 hours, somebody else had to come in and use another cab to take over your spot. That's not the case here. So if you want to drive 60 hours, that's your prerogative as a driver. If you want to drive 60 hours and take a 4-hour cab in the middle, because they're not that many drivers, and trust me, all the cab drivers and all the flights at Phoenix by Harbor, that's your prerogative. Conversely, if you only have a cab driver, which, again, plenty of boy time for him, since he didn't drive, he went and took off some time off, I think he went and took off some time off, and he got somebody to sell him for him so that he would keep the rest of his life. That's his decision. He could have turned his vehicle back. He's free from his needs if he don't want to. He just didn't want to do that. He made enough money with it that it made sense to sell this to somebody else. When do you sell this? Do you sell these at good days and good times? If you use some of these bits on an even basis with the other driver? How much do you ask the other driver to do two things like that instead of driving a cab? And one of the interesting components is, even though it's supposedly assumed to have the same level of control for all drivers, not a single individual who's a relief driver signs an agreement with AAA and a cab. Only the leaseholder binds him or herself to the operations of that cab. That person is personally responsible financially for the lease itself and for the issues that arise with the vehicle while it's being leased by that person. If that person decides that two other people are going to drive the cab the majority of the time, that's this person's decision. They're not even in a contractual relationship with my clients at that particular point in time. In fact, many relief drivers have been used the option of being relief drivers for drivers and multiple different pay providers. So they're not just with AAA and a cab, they're also relief drivers for Mayflower, which is another one of the providers. It's perfectly within their purview to decide to do that. And they, on the other hand, are bound contractually to abide by those regulations that the plaintiffs are responsible for in this particular case. What you want to see is if they are going to drive for Mayflower and for AAA and a cab they've got to be equally responsible to the city of Phoenix for abiding by all the those regulations, very far. But where has it been mandated upon them by the city code? How polite they are, whether they're boisterous. So literally, boisterous is listed in the regulations as it imposes upon anybody who is a ground transportation, a commercial ground transportation let's take a number. It's not for my clients. There is nothing that in the pile and pile and pile of record that we have assembled that is one regulation that my clients have mandated upon themselves. Just out of the blue on what the drivers can have there. So, in the event of a Wednesday or Saturday in the event of a high demand my client is really at the mercy of their business partners and their drivers. If the drivers want to make money, and they do that's why they engage in a relationship to begin with. They'll be there when there's a turn. In fact, they'll rush to get back there to get two or three quick fare so that they have a great day where the fare is not carried to time. And that's too much more to consider an economic reality that's their inconvenience from my client's statement we can pass on the radio that there's money to be made at the airport that doesn't mean that any of them are going to show up. The only thing that drives them is the opportunity to try to end up making it. And the other thing that I would say is the right approach in this particular case is not to get stuck in the weeds and lost for all those regulations. I think the right approach was exactly what what the 7th Circuit did in a case like that in a supplemental briefing which was Gallaudet v. City of Chicago back in 2016. And in that one, Ms. Gallaudet made the argument that there were so many regulations in the city imposed upon her as a cab driver if she was an employee in the city of Chicago. Well, the court of appeals did not even bother to go through the economic reality set. It was like, this can't be the case. It should simply not be regulations are regulations. Employment rules are employment rules. We're not going to get confused by that. And that's exactly the situation that we have here in our city. That's exactly the ruling that needs to be reached. And that the district court found it to be the case. Any other questions? Thank you very much. Any other questions? May it please the court, I appreciate the opportunity for a rebuttal. I think that the reference to the Callahan case hammers home the point that AAA Yellow Cab continues to push a standard that is not the standard that's applied in the Fair Labor Standards Act. And it's the standard that the district court has applied as well. What does not matter is what, theoretically, the airport drivers can do. What matters is what actually happens on a day-to-day basis and how they actually perform their jobs. What's your response to counsel's economic incentive argument? As far as the reason they go back to the airport? Does it make sense to me that you want to be there at a time when the demand for your services is high? My response, one, is that the economic incentive is actually on AAA Yellow Cab to ensure that its airport drivers return to the airport. And the... But doesn't the driver have the economic incentive from the person owning it to pick up his pay fares and make as much money in a shorter period of time? I think that that actually proves the economic dependence he has on AAA Yellow Cab. Well, there's the economic reality of supply and demand. We're told that there is a compressed group of potential fares, a high incentive in Arizona at Sky Harbor Airport. And in those times when the airport is busiest, if the driver wants to maximize the amount of money that he's going to make on a particular day, he wants to be there at those times. That makes perfect sense to me. Well, respectfully, there's not evidence in the record that supports that. What the evidence in the record shows is that AAA Yellow Cab sends out messages demanding that the airport drivers return. And by definition, if the airport drivers were always voluntarily doing that, there wouldn't be the need for this redeemment. Why wouldn't, from an economic reality standpoint, why wouldn't the cab driver who was in the vicinity of the airport not want to respond to that message and get back to the airport? Because it means that we're short on cabs anymore. Well, the concern would be if they overturn and heat management were warning, they run the risk. As Mr. Gellman testified to, that he can terminate an airport driver and take away their vehicle, and take away their means to... Can the city also revoke their permit? The city can revoke its permit, but it's Tracey Rivas, the City of Phoenix representative, testified that the city is not involved with making sure that the specific driver returns to the airport. That issue is delegated to AAA Yellow Cab as soon as responsibility for making sure that the airport driver is at the airport. Thank you. Thank you very much. This target is submitted and we will take a short 10 minute recess.
judges: Tallman, Watford, Guirola